UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**PREMIUM PARKING SERVICE, LLC**                    **CIVIL ACTION**

**VERSUS**                                          **NO. 23-3405**

**PHILIP OLIVIER, ET AL.**                          **SECTION: D (4)**

## ORDER AND REASONS

Before the Court is a Motion for Temporary Restraining Order and to Set Preliminary Injunction Hearing filed by the Plaintiff, Premium Parking Service, LLC.[1] The Defendants, Philip Olivier and XYZ Companies, have not yet made an appearance in this matter. Accordingly, consideration of the instant Motion is *ex parte*. After careful consideration of the Plaintiff's First Amended Verified Complaint, attached exhibits and affidavits, Motion, and applicable law, the Court **DENIES** the Motion and declines to issue a Temporary Restraining Order at this time.

### I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff Premium Parking Service, LLC ("Plaintiff" or "Premium") is a parking operator and parking-related technology company operating in sixty markets with over 750 locations throughout the United States.[3] Premium utilizes its own proprietary cloud-based parking management software to run its operations.[4]

---

[1] R. Doc. 3.
[2] For purposes of this Analysis, the Court accepts the allegations in the First Amended Verified Complaint as true.
[3] R. Doc. 9 at ¶ 1.
[4] *Id.*

Defendant Philip Olivier[5] ("Defendant" or "Olivier") began working at Premium in New Orleans, Louisiana in 2012 and was promoted to Market President for the Gulf Coast Market in August 2018.[6] As Market President, Olivier was entrusted with and had access to Premium's confidential business information and trade secrets including Premium's financial information, business development efforts, customer contacts, and customer-related information for the Gulf Coast market.[7] On April 21, 2022, Olivier formed CLEARPARC, LLC—an alleged competitor of Premium—on April 21, 2022, and by June 15, 2022, "was working on a business license application" for that entity.[8] During his time with Premium, Olivier signed several agreements with Premium acknowledging the confidentiality of the information that Premium entrusted him with.[9]

On April 13, 2023, Olivier requested a 33% equity stake in Premium's Gulf Coast market.[10] Olivier resigned on April 28, 2023, before Premium had time to offer a counterproposal.[11] Premium alleges that the "unexpected and odd turn of events prompted Premium's executive team to investigate activities with the Gulf Coast Market."[12] Premium further alleges that "[a]t this point, Premium began to uncover

---

[5] Although Plaintiff also names "XYZ Company" as an additional defendant in this action, Plaintiff avers that "XYZ Company is a placeholder defendant for any entities acting in active concert with Mr. Olivier." *Id.* at ¶ 15. For the purposes of this Order, the Court will only discuss the allegations against Defendant Olivier.
[6] *Id.* at ¶ 2.
[7] *Id.* at ¶ 3.
[8] *Id.* at ¶¶ 50–51.
[9] *Id.* at ¶¶ 22–26; R. Docs. 9-1, 9-2, and 9-3. Although Premium references the agreements signed by Olivier to not disclose or utilize any confidential information without Premium's authorization, Premium does not bring any claims for breach of contract against Olivier.
[10] R. Doc. 9 at ¶ 52.
[11] *Id.* at ¶ 53.
[12] *Id.* at ¶ 54.

the embezzlement scheme and started trying to confirm just how far the tenacles [sic] of this scheme extended."[13] According to the Complaint, Olivier stole Premium's trade secrets and confidential business information[14] in the days and weeks leading up to his unexpected April 28, 2023 resignation from Premium.[15] Specifically, Premium alleges that on April 12, 2023 and April 13, 2023, Olivier connected a Western Digital external USB hard drive to his Premium-provided work computer and transferred the entire contents of his Premium Outlook email account to the hard drive.[16] The Complaint alleges that with this transfer of information "Mr. Olivier can essentially recreate the contents of his Premium email account on devices outside of Premium's control."[17] Premium also alleges that Olivier used a personal Dropbox account to transfer and store Premium's protected information including files containing "highly confidential financial records belonging to Premium that relate to the local markets."[18] Premium became aware of the April 12, 2023 and April 13, 2023 hard drive transfer and Olivier's Dropbox account following a forensic computer examination conducted by Premium.[19]

---

[13] *Id.* at ¶ 55.
[14] The trade secrets alleged include Premium's customer lists and contact information, customer pricing information, financial information, business and project forecasts, business development tools and efforts, and contracts. R. Doc. 9 at ¶ 90. Premium alleges that it undertook substantial measures to keep these documents confidential such as by restricting access to only certain high-level employees within the company and password-protecting the documents. *Id.* at ¶ 27.
[15] *Id.* at ¶ 54. Premium also provides numerous allegations surrounding alleged shell companies created in 2019, 2021, and 2022 by Olivier for the purpose of embezzling funds from Premium. *Id.* at ¶¶ 32–49.
[16] *Id.* at ¶¶ 66, 67.
[17] *Id.* at ¶ 67.
[18] *Id.* at ¶¶ 71–73.
[19] *Id.* at ¶¶ 62–65.

On May 4, 2023, Premium sent Olivier a "cease and desist" letter in which Premium reminded Olivier of his contractual obligations of confidentiality and demanded that Olivier return any company property in his possession including any computer or cell phone and make any computing device or account available for an independent forensic inspection.[20]

Premium filed its Verified Complaint for Damages, Temporary Restraining Order, and Injunctive Relief on August 14, 2023 asserting claims under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. R.S. 51:1431 *et seq.*, and the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, *et seq.*, and for breach of fiduciary duty and/or duty of loyalty under Louisiana law.[21] Contemporaneously with the filing of its Verified Complaint, Premium filed the instant Motion for Temporary Restraining Order and to Set Preliminary Injunction Hearing moving for the issuance of a TRO to prohibit Olivier from using, disclosing, or destroying any of Premium's trade secrets and to mandate that Olivier return any information and external storage devices referenced in the Verified Complaint containing Premium's confidential information.[22] Attached to Premium's Verified Complaint is: (1) a copy of Premium's Business Ethics Pledge signed by Olivier; (2) Premium's Employee Handbook; (3) a copy of the Non-Competition, Non-Solicitation and Confidentiality Agreement signed by Olivier; (4) the May 4, 2023 cease-and-desist letter sent by

---

[20] *Id.* at ¶ 60; R. Doc. 9-4.
[21] R. Doc. 9.
[22] R. Doc. 3.

Premium's counsel to Olivier; (5) a Verification of Richard Bruccoliere, the digital forensic analyst who conducted the forensic examination of Olivier's work computer for Premium; and (6) a Verification of Ben Montgomery, the President of Plaintiff Premium Parking Service, LLC.[23]

On August 15, 2023, this Court held a telephone status conference in the matter.[24] During that conference, counsel for Premium clarified that Olivier returned his Premium work computer to Premium at some time in late May. Counsel for Premium also indicated that discussions took place between the parties throughout May, June, and July 2023 but have since terminated.[25] Premium's counsel further advised that Premium did not commence its forensic investigation of Olivier's work computer until late July 2023 after discussions with Olivier's counsel had fallen through and that the results of that investigation were not completed and provided to Premium until recently.

On August 16, 2023, Premium filed a First Amended Verified Complaint for Damages, Temporary Restraining Order, and Injunctive Relief.[26] The Court has compared the original Verified Complaint with the Amended Verified Complaint and confirmed that all the citations to the Verified Complaint relied upon by the Court appear verbatim in the First Amended Verified Complaint. Based upon its review of the First Amended Verified Complaint, it appears that Premium made several minor

---

[23] R. Docs. 9-1, 9-2, 9-3, 9-4, 9-5, and 9-6, respectively.
[24] R. Doc. 8.
[25] Having learned about these discussions, the Court reached out to the attorneys who were representing Olivier during those discussions to seek their participation in the August 15, 2023 Telephone Status Conference. *See* R. Doc. 8. Both attorneys informed the Court that they were not representing Olivier in this matter.
[26] R. Doc. 9.

additions and corrections regarding the computer forensic analysis and the results thereof. The Court has adjusted its citations to the First Amended Verified Complaint accordingly and has considered the First Amended Verified Complaint in its Analysis.

## II.   LEGAL STANDARD

To be accorded a Temporary Restraining Order, a plaintiff must demonstrate: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the TRO is not issued, (3) that the threatened injury if the TRO is denied outweighs any harm that will result if the TRO is granted, and (4) that the grant of a TRO will not disserve the public interest.[27] A temporary restraining order is "an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[28] If a party fails to meet any of the four requirements, the district court must deny the application for a temporary restraining order.[29] Further, a party requesting the issuance of an *ex parte* temporary restraining order must provide "specific facts . . . [which] clearly show that *immediate and irreparable* injury, loss, or damage will result to the movant before the adverse party can be heard in opposition,"[30] and the movant's attorney

---

[27] *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quoting *Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 34 (5th Cir. 1989)). The standard for obtaining a temporary restraining order is the same as that for a preliminary injunction.
[28] *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)). The Court notes that insofar as Plaintiff's TRO request moves the Court to authorize the seizure of Premium materials within Olivier's possession, the requirements provided by 18 U.S.C. § 1836(b)(2) apply for civil seizure. That statute specifies that an *ex parte* order providing for the seizure of property may be issued only under "extraordinary circumstances." 18 U.S.C. § 1836(b)(2)(A)(i).
[29] *Bluefield Water Ass'n*, 577 F.3d at 253.
[30] Fed. R. Civ. P. 65(b)(1)(A) (emphasis added).

must certify "in writing any efforts made to give notice and the reasons why it should not be required."[31] Additionally, the party requesting the TRO must provide "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[32]

### III. ANALYSIS

The Court finds that Premium has failed to demonstrate that there is a substantial threat it will suffer "immediate and irreparable injury" in the absence of a temporary restraining order and therefore denies Premium's Motion. To obtain a TRO, an "extraordinary and drastic remedy,"[33] a party must affirmatively demonstrate not only that it will be irreparably harmed by the failure of the court to issue a TRO but that the irreparable harm is so imminent or immediate that the party seeking relief cannot wait until the opposing party receives notice and a hearing for a preliminary injunction can be held.[34] "A plaintiff's delay in seeking a temporary restraining order is held as an indication that there is no immediate threat[.]"[35] Courts have routinely held that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."[36] The Court finds that Plaintiff has failed to meets

---

[31] Fed. R. Civ. P. 65(b)(1)(B).
[32] Fed. R. Civ. P. 65(c).
[33] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).
[34] Fed. R. Civ. P. 65(b)(1)(A).
[35] 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2951 (3d ed.); *accord SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.*, 2022 WL 137051, at *3 (E.D. La. Jan. 14, 2022) (Vance, J.); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief where movant delayed three months in making its request for relief).
[36] *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).

its burden of showing a substantial threat that it will be *immediately* harmed in the absence of a TRO.

The Court finds the timing of events as alleged in the First Amended Verified Complaint to be detrimental to Premium's requested relief. As discussed above, Olivier resigned from Premium on April 28, 2023.[37] Premium began its investigation into Olivier shortly thereafter.[38] Soon thereafter, or, as Plaintiff alleges, "[a]t this point, Premium began to uncover the embezzlement scheme and started trying to confirm just how far the tenacles [sic] of this scheme extended."[39] Premium sent Olivier a cease-and-desist letter on May 4, 2023 demanding that he return all Premium company property and information and make any device or account available for forensic inspection.[40] Then, over the course of the next several months, Premium and Olivier, through counsel, engaged in discussions to resolve any issues between the parties.[41] Despite possessing Olivier's work laptop since late May 2023, Premium did not begin its forensic investigation of the laptop until late July 2023.[42] Finally, this lawsuit and accompanying Motion for a TRO were not filed until August 14, 2023. All told, nearly four months passed after Olivier suddenly resigned and

---

[37] R. Doc. 9 at ¶ 53.
[38] *Id.* at ¶ 54.
[39] *Id.* at ¶ 55.
[40] *Id.* at ¶ 60; R. Doc. 9-4.
[41] This fact was not alleged by Premium in either the Complaint or the Motion, but stated by counsel for Premium during the August 15, 2023 Telephone Status Conference. Rule 65(b)(1)(A) specifies that a court may only issue a TRO if "specific facts in an affidavit or a verified complaint clearly show" that the movant is entitled to TRO relief.
[42] This, too, was alleged for the first time by Premium's counsel during the Telephone Status Conference.

Premium began to uncover his embezzlement scheme before Premium filed this action.[43]

To be clear, Premium contends that it filed this action shortly after receiving the results from the forensic investigation of Olivier's computer.[44] The timing of the forensic investigation is not specified in the First Amended Verified Complaint, however. Premium has not provided the Court with sufficient information meeting the requirements of Rule 65(b) regarding when it first became aware of Olivier's alleged theft of confidential information. During the August 15, 2023 Telephone Conference, counsel for Premium emphasized that Premium worked diligently to file this lawsuit and Motion once it became aware of Olivier's transfer of Premium's information to an external hard drive and Dropbox account. That information ignores that Premium waited several months *after* receiving Olivier's laptop to begin the forensic investigation and that, as evidenced by the May 4, 2023 cease-and-desist letter sent to Olivier, Premium suspected that Olivier might have access to Premium's trade secrets and confidential information months ago.[45] That Premium only recently received alleged confirmation of Olivier's theft of confidential information does not establish that the harm to Premium is imminent.

---

[43] *See SMH Enterprises*, 2022 WL 137051, at *3 ("Plaintiff waited over a month before filing this TRO. Such a delay, while not dispositive, undermines plaintiff's assertion that is has suffered and will continue to suffer irreparable harm without the immediate relief provided by a TRO.").

[44] According to counsel for Premium, Premium received the results of the forensic investigation on Friday, August 11, 2023. Again, this detail was not stated in the First Amended Verified Complaint or an affidavit, as required by Fed. R. Civ. P. 65(b)(1)(A).

[45] *See RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F. Supp. 2d 70, 74 (D.D.C. 2007) (denying issuing a TRO where plaintiff had waited for months after employee had left to file suit and where "some elements of [plaintiff]'s alleged injury ha[d] been known for months").

More importantly for this Court's analysis, Plaintiff contends that Olivier allegedly transferred Premium's confidential information on April 12 and April 13, 2023, yet, four months later, counsel for Premium could not provide any evidence that Olivier had *used* any of the stolen trade secrets.  While an injunction may be issued in the presence of "threatened" misappropriation,[46] the issuance of a TRO requires a movant to demonstrate *immediate* likelihood of injury; "[s]peculative injury is not sufficient."[47]  During the telephone conference to discuss Plaintiff's motion, the Court specifically asked if there was any indication or evidence that Olivier had used any of the information.  Plaintiff confirmed that there was not at this time but stressed that Olivier's possession of the information could lead to its use.  Such speculation does not support the finding of a substantial threat of immediate and irreparable harm.  Further, that Premium engaged in discussions throughout the summer with Olivier and only filed this suit after those discussions broke down militates against a finding a substantial threat of imminent harm.[48]

Because the Court finds that Premium has not met its burden in demonstrating a substantial threat that "*immediate and irreparable* injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," the Court finds it unnecessary to address the other requirements for the issuance of

---

[46] *See* La. R.S. 51:1432; R. Doc. 3-1 at p. 18.
[47] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).
[48] *See Rumfish Y Vino Corp. v. Fortune Hotels, Inc.*, 403 F. Supp. 3d 1227, 1232 (M.D. Fla. 2019) (finding no threat of imminent harm necessitating the issuance of a TRO where counsel for the parties had been in discussions for months, where plaintiffs had sent defendants a cease-and-desist letter, and where plaintiffs had notice of the alleged harm for over a month).

a TRO. If a party fails to meet any of the four requirements, the district court must deny the application for a temporary restraining order.[49]

## IV.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the Plaintiff's Motion for Temporary Restraining Order (R. Doc. 3) is **DENIED**. A Telephone Status Conference shall be held on **Monday, September 11, 2023** at **3:00 p.m. (CST)** to discuss the selection of a date for the Preliminary Injunction Hearing.

New Orleans, Louisiana, August 16, 2023.

**WENDY B. VITTER**
**United States District Judge**

---

[49] *Bluefield Water Ass'n*, 577 F.3d at 253.